[Cite as *Pipino v. Norman*, 2017-Ohio-9048.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| SAMUEL D. PIPINO ET AL., | ) | CASE NO. 16 MA 0153 |
| | ) | |
| PLAINTIFFS-APPELLEES/ | ) | |
| CROSS-APPELLANTS, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| FORREST NORMAN ET AL., | ) | |
| DEFENDANTS-APPELLANTS/ | ) | |
| CROSS-APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from the Court of Common
Pleas of Mahoning County, Ohio
Case No. 13 CV 3187

JUDGMENT:     Affirmed in part; Reversed in part;
Remanded.

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated:  December 12, 2017

[Cite as *Pipino v. Norman*, 2017-Ohio-9048.]
APPEARANCES:

For Plaintiffs-Appellees/Cross Appellants:    Atty. Mark A. Hanni
Atty. Jason Small
829 Southwestern Run
Youngstown, Ohio 44514

For Defendants-Appellants/Cross Appellees:    Atty. Stephen E. Walters
Atty. James O'Connor
Atty. Brian D. Sullivan
Reminger Co., L.P.A.
101 West Prospect Avenue, Suite 1400
Cleveland, Ohio 44115

Atty. Thomas E. Dover
Atty. Melanie R. Irvin
Atty. Colleen Mountcastle
Gallagher Sharp, LLP
1501 Euclid Avenue
Bulkley Building, Sixth Floor
Cleveland, Ohio 44115

ROBB, P.J.

**{¶1}** This case presents an appeal and a purported cross-appeal. Gallagher Sharp (the law firm) appeals the decision of the Mahoning County Common Pleas Court granting summary judgment to Samuel D. Pipino et al. (the clients) on the law firm's quantum meruit counterclaim. The trial court held the quantum meruit claim was not sustainable as the parties' agreement set forth the fees. The law firm points to a Supreme Court precedent stating termination of the attorney-client relationship and the accompanying contingency agreement does not preclude the attorney from recovering the reasonable value of services rendered prior to discharge, whether the termination was with or without just cause. The law firm states the claim for recovery of fees is not on the prior contract and the terms of a "stipulation" allegedly attached to the contract were in dispute. We conclude the clients were not entitled to judgment as a matter of law on the quantum meruit counterclaim. Accordingly, the entry of summary judgment for the clients on the law firm's counterclaim is reversed, and the counterclaim is remanded for further proceedings.

**{¶2}** The clients appeal the trial court's grant of summary judgment to the law firm and Attorney Forrest A. Norman on the clients' legal malpractice claim. The trial court held the clients' settlement in the underlying case after termination of the attorney-client relationship was fatal to the malpractice claim. The court also found a waiver principle applicable due to the settlement. The clients contend the attorney's negligence diminished the value of their underlying case or at least caused damages from loss of use of the money during the delay. The issue is whether there was any evidence the attorney's negligence proximately caused damages after taking into consideration a settlement was entered in the underlying case after the attorney was terminated. For the reasons explained infra, we hereby uphold the grant of summary judgment entered against the clients on their legal malpractice claim.

## STATEMENT OF THE CASE

**{¶3}** The clients filed a complaint alleging legal malpractice against Attorney Norman and the law firm where he was employed. A counterclaim was filed seeking recovery of attorneys' fees under the doctrine of quantum meruit. The underlying case involved the clients' dissatisfaction with investments made by First Merit Bank in the clients' trust portfolios from 2007 through 2009. The clients instructed the bank to make safe and conservative investments. The bank suggested exchange-traded funds (ETFs); the clients consented while reiterating their instructions as to safe and conservative investments. The bank invested in ETFs; at least one of the ETFs was comprised of derivatives (was leveraged) rather than merely stocks. When the $2 million beginning balance incurred $1.29 million in losses, the clients instructed the bank to sell the investments.

**{¶4}** In 2010, the clients hired Attorney Norman of Gallagher Sharp to represent them in a breach of fiduciary duty suit against the bank and certain bank employees. Attorney Apelis, a partner at Gallagher Sharp, assisted Attorney Norman. The agreed compensation was a one-third contingency fee plus expenses. Attorney Norman filed a complaint on behalf of the clients against the bank and the bank's employees, resulting in *Pipino v. Onuska*, Mah. Cty. C.P. No. 10CV3548. The case was voluntarily dismissed on April 4, 2012, after the trial court refused to extend a previously-extended discovery deadline. Private mediation with the bank proceeded in November 2012, after which the bank filed a declaratory judgment action against the clients in Cuyahoga County. The clients filed a counterclaim. The clients also attempted to refile the Mahoning County lawsuit against the bank, but the court dismissed this action due to the pending Cuyahoga County case.

**{¶5}** The clients say they terminated Attorney Norman on March 26, 2013 and used other attorneys at the law firm; the law firm states other attorneys at the law firm took over the case when Attorney Norman left the firm. The clients terminated the law firm's representation in July 2013 and hired a new attorney. On September 18, 2013, the clients settled the case against the bank, and the Cuyahoga County suit was dismissed.

**{¶6}** In November 2013, the clients filed the within legal malpractice action against Attorney Norman and Gallagher Sharp (for vicarious liability). The complaint claimed Attorney Norman committed legal malpractice by: failing to complete discovery, interview an expert witness, and prepare for trial in the Mahoning County action against the bank, all necessitating voluntary dismissal; disobeying the clients' instruction to immediately refile the suit in Mahoning County, while assuring the clients venue would not be lost; and agreeing to schedule mediation with the bank instead of immediately refiling the suit without first consulting with the clients. Regarding the Cuyahoga County suit, the clients complained Attorney Norman failed to engage in discovery and scheduled their depositions in contravention of their instructions that they not be deposed until the bank provided discovery.

**{¶7}** The quantum meruit counterclaim filed by Attorney Norman and the law firm asked for the reasonable value of legal services and advanced expenses. The counterclaim pointed out: the action against the bank was filed in 2010; the bank's efforts to remove the suit to federal court were successfully opposed; upon remand to state court, there was extensive discovery conducted; interrogatories and requests for production were served on the bank; responses were submitted to the bank's interrogatories, requests for production, and requests for admissions; experts were engaged; numerous court appearances were made; motions to compel discovery were filed and defended; the clients elected to voluntarily dismiss due to an impasse in discovery; and mediation lasted for several hours, after which the clients rejected a settlement offer. After the Cuyahoga County action was filed, the action was defended, a counterclaim was filed, discovery was conducted (with multiple depositions), and a motion to compel discovery was filed on behalf of the clients.

**{¶8}** On April 20, 2015, Attorney Norman and the law firm filed a motion for summary judgment on the clients' legal malpractice claim. They asserted: the alleged discovery omissions in the original action that was voluntarily dismissed did not harm the case against the bank; instead of completing discovery in the second action and taking the case to trial, the clients settled with the bank; the clients waived their malpractice claim by settling the underlying case, citing the Eighth District's

*Sawchyn v. Westerhaus* case; loss of venue in one county is not a basis for malpractice; proximate cause was lacking as there was no showing the alleged negligence caused a loss since nothing prohibited the clients from taking their case against the bank to trial; and the underlying case required expert testimony on the standard of care for a financial professional, but the clients failed to provide an expert report by the deadline in order to prove their "case within a case."

{¶9} An affidavit was provided to confirm the clients failed to provide an expert report on the bank's breach of fiduciary duty in the underlying case. In addition, the affidavit of Attorney Apelis attested: extensive discovery was conducted in both cases; a financial expert was retained in both cases; Attorney Norman left the firm on March 26, 2013; the court in Cuyahoga County ordered the clients to submit to deposition over objection after non-party depositions had been taken; and no discovery deadlines were set in the Cuyahoga County case at the time the law firm was terminated. The motion also pointed to Mr. Pipino's deposition testimony where he vaguely stated he lost three years and his case was hurt by not getting discovery.

{¶10} On May 5, 2015, the clients responded to the motion for summary judgment as to their legal malpractice claim. A reply in support of the motion for summary judgment was filed on July 1, 2015. The clients then received leave to file a cross-motion for summary judgment on the quantum meruit counterclaim filed against them.

{¶11} On August 18, 2015, the clients filed a motion for summary judgment on the counterclaim, arguing the existence of the express contract nullified the quasi-contractual quantum meruit claim. They cited to Mr. Pipino's deposition at page 51, where he said he told Attorney Norman when he hired him that he would not agree to a settlement unless they recovered all of their losses (as he would rather take the case to trial); he said Attorney Norman advised he would have to check with the law firm's partners and called him later to say he received their approval. The clients suggested a quasi-contractual quantum meruit claim would have been nullified by a written agreement, noting an attorney is to have the client sign a written contingency fee agreement pursuant to Rule of Professional Conduct 1.5. The clients

alternatively argued the elements of a quantum meruit claim could not be established because there was no benefit conferred and the equities do not favor recovery for services rendered due to the malpractice committed.

{¶12} The September 1, 2015 response to the motion for summary judgment on the counterclaim cited to the Supreme Court's *Fox* and *Reid* cases, which held attorneys' fees can be recovered through quantum meruit where a contractual relationship (whether express or implied) was terminated (whether with or without just cause). The law firm and attorney argued the disputed terms of a contingency fee agreement are irrelevant after the relationship is prematurely terminated. They also stated the quality of work is a distinct issue which could relate to the reasonable value of services rendered but which would not bar the quantum meruit action. They set forth itemized evidence of 1,061.4 hours of work with hourly rates for each item, totaling $143,714, plus $20,706.63 in expenses.

{¶13} More than one year later, on September 12, 2016, the trial court granted both summary judgment motions in separate entries, resulting in the disposal of the entire case. Both entries stated there was no just reason for delay. *See* Civ.R. 54(B).

{¶14} In granting the clients' motion for summary judgment on the counterclaim, the court held: "the agreement between Plaintiff and Defendants set forth their agreement with respect to fees. As such, no quantum meruit claim is sustainable." The law firm filed a timely notice of appeal from this entry on October 11, 2016.

{¶15} In separately granting the motion for summary judgment filed by the attorney and the law firm on the clients' legal malpractice claim, the court held: "the acceptance of the settlement agreement by Plaintiff, which included a release provision, is fatal to the present claims submitted by Plaintiff. Moreover, the 8th District Court holding in *Westerhaus*, is applicable to the facts in the case at bar." The clients filed what they termed a notice of cross-appeal from this entry on October 17, 2016.

<u>Preliminary Issue as to Notice of Cross-Appeal</u>

{¶16} App.R. 3(C)(1) provides: "Cross Appeal Required. A person who intends to defend a judgment or order against an appeal taken by an appellant and who also seeks to change the judgment or order or, in the event the judgment or order may be reversed or modified, an interlocutory ruling merged into the judgment or order, shall file a notice of cross appeal within the time allowed by App.R. 4." *Compare* App.R. 3(C)(2) ("Cross Appeal and Cross-Assignment of Error Not Required. A person who intends to defend a judgment or order appealed by an appellant on a ground other than that relied on by the trial court but who does not seek to change the judgment or order is not required to file a notice of cross appeal or to raise a cross-assignment of error.").

{¶17} Here, the clients' appeal of the entry of summary judgment on their legal malpractice claim is not the defense of the judgment appealed by the law firm; they are not seeking to change the judgment appealed by the law firm or seeking to change an interlocutory order that merged with the final judgment in the event the final judgment (appealed by the law firm) is reversed. Rather, they are appealing a different final judgment in the case. Accordingly, the clients should have filed a separate notice of appeal, which would have been assigned its own case number, rather than a notice of cross-appeal.

{¶18} This situation is similar to the situation in this court's *Estate of Pizzoferrato* case, where the trial court issued two judgment entries on the same day. One entry overruled party A's exception to a final account; party A filed a notice of appeal from this entry. The other entry granted judgment for party B in his concealment action; party B filed a notice of cross-appeal from this separate entry (as he contested the amount of his recovery). We stated: "As a preliminary matter, it must be noted that [party B] should have filed a separate appeal in this matter and not a notice of cross-appeal. His claims do not fall within the purview of a true cross-appeal, since he is appealing an issue arising from a judgment entry wholly separate and distinct from the entry referred to in appellant's notice of appeal." *In re Estate of*

*Pizzoferrato*, 190 Ohio App.3d 123, 2010-Ohio-4848, 940 N.E.2d 1018, ¶ 14 (7th Dist.). We then exercised our discretion to proceed in spite of this issue.

**{¶19}** We explained this was permissible because the mistitled notice of cross-appeal was filed within the time for filing a direct appeal under App.R. 4(A), implying the extra time provided for multiple appeals or cross-appeals was not available in the appeal from two separate final entries. *Id.* at ¶ 15. Notably, App.R. 4(B)(1) applies to qualifying multiple appeals as well as cross-appeals. Specifically, the rule provides: "Multiple or Cross Appeals. If a notice of appeal is timely filed by a party, another party may file a notice of appeal within the appeal time period otherwise prescribed by this rule or within ten days of the filing of the first notice of appeal." App.R. 4(B)(1).

**{¶20}** This division requires reference to the time requirements in App.R. 4(A). For instance, "a party who wishes to appeal from an order that is final upon its entry shall file the notice of appeal required by App.R. 3 within 30 days of that entry." App.R. 4(A)(1). *See also* App.R. 4(A)(2) ("a party who wishes to appeal from an order that is not final upon its entry but subsequently becomes final--such as an order that merges into a final order entered by the clerk or that becomes final upon dismissal of the action--shall file the notice of appeal required by App.R. 3 within 30 days of the date on which the order becomes final.").

**{¶21}** Construing the *Pizzoferrato* holding and reading App.R. 4(B)(1) in conjunction with App.R. 4(A), it would appear the ten-day alternative in App.R. 4(B)(1) cannot be used to extend the time for filing a second notice of appeal in the same lower court case where the second notice of appeal is filed from a separate final judgment entered in the case. In other words, the multiple appeals referred to in App.R. 4(B)(1) are multiple appeals from the same final judgment (or appeals from orders that became final due to the same final judgment) not multiple appeals from separate final entries in the same case. Although the clients' notice of appeal at first glance appears to have relied on the ten-day alternative, there is an issue with the court's judgment and the clerk's docket which would make the clients' appeal timely as a direct appeal from the final judgment.

**{¶22}** That is, the notice of cross-appeal was filed within the time for filing an original appeal because the trial court's judgment entry failed to instruct the clerk to serve the parties and the clerk never noted service in the docket. "When the court signs a judgment, the court shall endorse thereon a direction to the clerk to serve upon all parties not in default for failure to appear notice of the judgment and its date of entry upon the journal." Civ.R. 58(B). "Within three days of entering the judgment upon the journal, the clerk shall serve the parties in a manner prescribed by Civ.R. 5(B) and note the service in the appearance docket." *Id.* "In a civil case, if the clerk has not completed service of the order within the three-day period prescribed in Civ.R. 58(B), the 30-day periods referenced in App.R. 4(A)(1) and 4(A)(2) begin to run on the date when the clerk actually completes service." App.R. 4(A)(3). Consequently, as was the case in *Pizzoferrato*, the clients' appeal was filed within the time for filing an original appeal from the judgment being appealed, without resort to the ten-day alternative in App.R. 4(B)(1).

**{¶23}** In sum, this court will exercise our discretion to proceed with the case in its current state, as we did in *Pizzoferrato*. We are effectively sua sponte amending the clients' notice of cross-appeal into a notice of appeal by eliminating the word "cross" from the title of the notice.

## SUMMARY JUDGMENT

**{¶24}** Summary judgment can be granted when there remains no genuine issue of material fact and reasonable minds can only conclude the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). The movant has the initial burden to show there is no genuine issue of material fact. *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 294, 662 N.E.2d 264 (1996). The non-moving party then has a reciprocal burden. *Id.* The non-movant's response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing there is a genuine issue for trial and may not rest upon mere allegations or denials in the pleadings. Civ.R. 56(E).

**{¶25}** The court is to consider the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the non-movant. *See, e.g.,*

*Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 11. Any doubts are to be resolved for the non-movant. *Leibreich v. A.J. Refrig., Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993). A trial court "may not weigh the proof or choose among reasonable inferences." *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121, 413 N.E.2d 1187 (1980). Still, "[t]he material issues of each case are identified by substantive law." *Byrd*, 110 Ohio St.3d 24 at ¶ 12. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**{¶26}** Civ.R. 56 must be construed in a manner that balances the right of the non-movant to have a jury try claims that are adequately based in fact with the right of the movant to demonstrate, prior to trial, that the claims have no factual basis. *Byrd*, 110 Ohio St.3d 24 at ¶ 11, citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We consider the propriety of granting summary judgment de novo. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Under a de novo standard of review, we review the case independently and give no deference to the trial court's decision. *See, e.g., Diley Ridge Med. Ctr. v. Fairfield Cty. Bd. of Revision*, 141 Ohio St.3d 149, 2014-Ohio-5030, 22 N.E.3d 1072, ¶ 10; *Hines v. State Farm Ins. Co.*, 146 Ohio App.3d 128, 131, 765 N.E.2d 414 (7th Dist.2001).

COUNTERCLAIM: QUANTUM MERUIT

**{¶27}** The law firm sets forth the following assignment of error:

"The trial court erred in granting Appellees Samuel D. Pipino's and Lorraine Pipino's Motion for Summary Judgment."

**{¶28}** The Ohio Supreme Court adopted a new rule in the 1989 *Fox* case: "When an attorney is discharged by a client with or without just cause, and whether the contract between the attorney and client is express or implied, the attorney is entitled to recover the reasonable value of services rendered the client prior to discharge on the basis of quantum meruit." *Fox & Associates Co., L.P.A. v. Purdon*, 44 Ohio St.3d 69, 541 N.E.2d 448 (1989), syllabus. The *Fox* decision overruled prior

precedent which stated that when an express contingency fee contract is breached by a client without just cause, the measure of damages is the full contract price, not the reasonable value of services rendered prior to discharge. *See, e.g., Roberts v. Montgomery*, 115 Ohio St. 502, 154 N.E. 740 (1926), paragraph two of syllabus; *Scheinesohn v. Lemonek*, 84 Ohio St. 424, 95 N.E. 913 (1911). The new rule balances the right of the client to terminate the attorney, with or without just cause, with the right of the attorney to be fairly compensated for services rendered. *Fox*, 44 Ohio St.3d at 71. Quantum meruit can be used whether there is an express contract for fees (written or oral) or where there is no express contract for fees (i.e., there is an implied contract). *See id.* at 72.

{¶29} "One of the central tenets of the *Fox* approach is that a client has an absolute right to discharge an attorney or law firm at any time, with or without cause, subject to the obligation to compensate the attorney or firm for services rendered prior to the discharge." *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry*, 68 Ohio St.3d 570, 574, 629 N.E.2d 431 (1994). "Once discharged, the attorney must withdraw from the case, and can no longer recover on the contingent-fee-representation agreement. The discharged attorney may then pursue a recovery on the basis of *quantum meruit* for the reasonable value of services rendered up to the time of discharge." *Id.*

{¶30} As the *Reid* case added, when a client terminates an attorney with a contingency fee agreement, the attorney's cause of action for quantum meruit arises on the successful occurrence of the contingency, e.g., the discharged attorney can recover after the client recovers in the underlying case and the attorney is usually not compensated if the client recovers nothing. *Id.* at 575-576. In addition, the attorney's recovery in quantum meruit is limited by the amount provided in the disavowed contingency contract. *Id.* at 576. In determining the reasonable value of services in a quantum meruit claim, the court is to consider the totality of the circumstances, including "[t]he number of hours worked by the attorney before the discharge[,] * * * the recovery sought, the skill demanded, the results obtained, and the attorney-client relationship itself." *Id.* Courts can also consider the factors for determining the

reasonableness of fees used by the rules governing attorney conduct. *Id.* at 576-577.

{¶31} The law firm provided evidence that 1,061.40 hours were dedicated to the clients' case against the bank. An affidavit attested the reasonable value of these services amounted to $143,714 and expenses were advanced for the benefit of the clients in the amount of $20,706.63. The clients claimed they owed nothing due to the express contract and the malpractice (which allegedly eliminated any benefit or inequity). The clients' reply to the counterclaim admitted there was an express contract which was not honored, but said the equitable doctrine of quantum meruit did not apply because: "The express contract between the Pipinos and Gallager Sharp provided that there would be no legal fees or expenses paid by the Pipinos unless the Pipinos received all of their losses and had pursued punitive damages."

{¶32} In moving for summary judgment on the counterclaim, however, the clients reframed the "stipulation to the contingency fee contract" to be that the clients would not agree to a settlement unless the law firm was able to recover all of the money the clients lost and cited only to page 51 of Mr. Pipino's deposition. The summary judgment motion urged this express contract vitiated the claim for quantum meruit. In the alternative, the clients claimed, due to the legal malpractice, there was no benefit conferred on them or their retention of any benefit would not be inequitable.

{¶33} In granting the clients summary judgment on the quantum meruit counterclaim, the trial court concluded: "the agreement between Plaintiff and Defendants set forth their agreement with respect to fees. As such, no quantum meruit claim is sustainable." To the extent the trial court's holding could be read as finding there can be no quantum meruit claim due to the mere existence of a contingency agreement prior to termination, both sides agree the Ohio Supreme Court's *Fox* and *Reid* cases permit recovery in quantum meruit where an attorney operating under a contingency fee agreement has been terminated prior to resolution in the underlying case. In defending the trial court's judgment, the clients urge the trial court was not suggesting a rule at odds with Supreme Court precedent but was

applying the specific terms of the express agreement which purportedly covers this situation and specifies how the firm must earn any fee.  The clients rely on their initial allegation that a particular term within the express agreement provided "that if Gallagher Sharp did not recover all of the Pipinos' losses, Gallagher Sharp could not be paid."

**{¶34}** The law firm states an express contingency agreement does not govern where the client terminates the relationship and the attorney sues in quantum meruit.  On this point, it should be noted the agreement remains relevant as:  the discharged attorney can recover only after the contingency occurs (the client recovers in the underlying case); the attorney is not usually compensated if the client recovers nothing; and the attorney's recovery in quantum meruit can be limited by the amount provided in the disavowed contract.  *Reid*, 68 Ohio St.3d at 575-576.

**{¶35}** In any event, the alleged "stipulation" (of full recovery) to the express agreement did not govern the occurrences in this case.  The clients did not establish the allegation made in their reply to the counterclaim, which is reasserted in their appellee's brief.  In these documents, the clients make a more extreme allegation than they made in their summary judgment motion.  The motion pointed only to page 51 of Mr. Pipino's deposition and fairly construed his deposition testimony.  He did not testify the law firm agreed no fees would be paid unless they recovered all of the clients' alleged losses from the bank, and the clients' motion for summary judgment did not assert this proposition.  Rather, Mr. Pipino testified:  "Because when I hired him, I told him either get all my money back or we'll go to court.  There's no in between.  His whole agreement was based on that, and I told him that up front.  He said he would have to get approval from his partners.  And he called me one or two days later and said he got it."  (Mr. Pipino Depo. 51).  Contrary to the clients' contention on appeal, Mr. Pipino's testimony does not express the law firm would receive no fees if the firm was terminated or if clients did not receive all of their alleged $1.3 million in losses.  The only available construction of the testimony is that, at the time of retention, the clients had no intention of settling for less and would

take their chances at trial (where recovery could be less than the amount of loss they believed was caused by the bank's breach of fiduciary duty).

**{¶36}** Even if such testimony could be dispositive if true, it was disputed by the non-movant. Attorney Apelis (a partner at Gallagher Sharp who assisted Attorney Norman in the clients' underlying case involving the bank) attested in an affidavit attached to the response to the clients' motion for summary judgment: "I am personally aware of the nature of the agreement for legal services that the Pipinos entered into with Gallagher Sharp in connection with the litigation referenced above. At no time did I, Mr. Norman, or Gallagher Sharp agree to represent the Pipinos with a stipulation that the Pipinos would accept a settlement no less than the full amount of the claimed losses in their investment portfolio." He also opined the law firm would never agree to undertake representation with such a stipulation. The trial court was to view this testimony in the light most favorable to the non-movant. The clients were not entitled to summary judgment where the parties disputed the existence of a particular, unusual term claimed by the clients/movants to be a part of the contingency fee agreement (for which no writing was produced).

**{¶37}** Furthermore, Mr. Pipino's testimony would not be dispositive even if it had been undisputed. Coming to an understanding that counsel will take a case to trial if the defendant will not make a certain settlement offer does not preclude a client from later agreeing to settle. Initially, it should be pointed out the clients consented to mediation with the bank after the voluntary dismissal. Mr. Pipino said he attended mediation to see what the bank would offer after discussing with his attorney that the offer would not reimburse him for all losses. (Although he wanted his attorney to refile the voluntarily dismissed case regardless of the scheduled mediation and although the bank refused to mediate if he refiled first, he could have chosen to refile and not participate in the private mediation.) More importantly, after terminating Attorney Norman and Gallagher Sharp and hiring a different attorney, the clients permitted their new attorney to settle with the bank for less than the total alleged loss rather than taking their chances with trial.

**{¶38}** Even viewing the unsupported assertion about an extreme stipulation allegedly attached to the contingency fee agreement, a total recovery by counsel was no longer possible upon termination, just as recovery by counsel in the underlying suit was no longer possible after termination in the *Fox* and *Reid* cases. At that point, the potential recovery became quantum meruit. In sum, the failure to earn a fee under a contingency contract due to termination prior to recovery does not preclude an action in quantum meruit, and the terms of the particular express agreement alleged by Mr. Pipino's testimony did not govern the termination of counsel and subsequent settlement with the bank or otherwise nullify the accrual of the quantum meruit claim for the recovery of the reasonable value of services rendered. [1]

**{¶39}** The clients alternatively argue they were entitled to summary judgment on the quantum meruit counterclaim because the law firm could not establish the benefit or inequity elements of quantum meruit. In supporting this argument, the clients focus on the alleged malpractice and also suggest the terms in the underlying agreement (addressed supra) are relevant to any equitable considerations. The law firm points out it provided evidence on the reasonable value of services rendered, noting an attorney discharged from a contingency fee agreement may "pursue a recovery on the basis of *quantum meruit* for the reasonable value of services rendered up to the time of discharge." *Reid*, 68 Ohio St.3d at 574. According to the clients' response, this evidence dealt with the total alleged damage amount but does not address the actual elements of quantum meruit. *See Fox*, 44 Ohio St.3d at 70 (adopting "a rule of law providing a discharged attorney quantum meruit as the measure of damages, regardless of whether there was cause for discharge.")

**{¶40}** "Upon discharge or withdrawal, a lawyer may also recover from a client the reasonable value of the services rendered under the doctrine of quantum meruit, which literally entitles the lawyer to 'as much as [is] deserved.'" *Columbus Bar Assn.*

---

[1] *Compare Belovich v. Saghafi*, 104 Ohio App.3d 438, 439, 441, 662 N.E.2d 391 (8th Dist.1995) (where a fee agreement provided any undue delay by the attorney would entitle the client to terminate the contract with no fees owed, the court found a genuine issue of material fact as to whether there was undue delay). The contractual term in *Belovich* specifically dealt with termination, not merely whether or not counsel recovered for the client, which becomes impossible after termination.

*v. Farmer*, 111 Ohio St.3d 137, 2006-Ohio-5342, 855 N.E.2d 462, ¶ 32, quoting *Black's Law Dictionary* 1276 (8th Ed.2004) and citing *Fox*, 44 Ohio St.3d 69 at syllabus. "Quantum meruit is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered." *Akron Bar Assn. v. Catanzarite*, 119 Ohio St.3d 313, 2008-Ohio-4063, 893 N.E.2d 835, fn. 1, quoting *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55, 544 N.E.2d 920 (1989) (citing *Fox* for this proposition).

{¶41} Recovery in quantum meruit is based upon the law of quasi-contract or implied contract. *Legros v. Tarr*, 44 Ohio St.3d 1, 7, 540 N.E.2d 257 (1989). "A quasi-contract is a contract implied so as to prevent injustice. * * * It is a legal fiction that does not rest upon the intention of the parties, but rather on equitable principles in order to provide a remedy." *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged*, 15 Ohio St.3d 44, 46, 472 N.E.2d 704 (1984) ("The two remedies most often associated with quasi-contracts are restitution and quantum meruit.") A quasi-contract claim involves the following elements: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment (the unjust enrichment element). *See Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20 (restitution as remedy); *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984) (quasi-contract claim). The purpose is not to compensate the plaintiff for any loss he suffered but to compensate him for the benefit he conferred on the defendant. *Johnson*, 106 Ohio St.3d 278 at ¶ 21.

{¶42} As aforementioned, the clients posit they received no benefit and/or their retention of any benefit without payment would not be unjust under the circumstances of this case involving alleged legal malpractice. In presenting this argument to defend summary judgment on the quantum meruit counterclaim, the clients are essentially claiming no reasonable person could find a benefit was conferred upon them and no reasonable person could find it would be inequitable to have more than 1,000 hours of legal services performed without compensation.

{¶43} In *Roberts*, an attorney sought quantum meruit recovery of fees for services rendered and the client filed a counterclaim for legal malpractice. The Tenth District observed, "while there might be a setoff provided [the client] were to prevail on her counterclaim for malpractice, the question of whether [the attorney] is entitled to be compensated for the reasonable value of the services he provided is legally and conceptually separate from the question of whether he committed malpractice." *Roberts v. Hutton*, 152 Ohio App.3d 412, 2003-Ohio-1650, 787 N.E.2d 1267, ¶ 50 (10th Dist.).

{¶44} Quantum meruit can be used by an attorney discharged under a contingency fee agreement "regardless of whether there was cause for discharge." *See Fox*, 44 Ohio St.3d at 70. As set forth above, the syllabus in *Fox* provided: "When an attorney is discharged by a client with or without just cause, and whether the contract between the attorney and client is express or implied, the attorney is entitled to recover the reasonable value of services rendered the client prior to discharge on the basis of *quantum meruit*." *Id.* at syllabus. Consequently, just cause for the discharge does not automatically eliminate the quantum meruit cause of action; nor does the lack of an express (whether oral or written) contract.

{¶45} In determining the reasonable value of the services, the totality of the circumstances are to be considered. *Id.* at 576-577. The law firm provided summary judgment evidence supporting the total expenses advanced and the hours worked with an itemized account containing various rates depending on the service provided. This is one factor in the totality of the circumstances review to be conducted by the trier of fact. *See id.* at 576-577 ("The number of hours worked by the attorney before the discharge is only one factor to be considered."). Other factors include the recovery sought, the skill demanded, the results obtained, the attorney-client relationship itself, and other guidelines in the rules governing professional conduct for determining a reasonable fee. *Id.* at 576-577.

{¶46} "Because the factors to be considered are based on the equities of the situation, those factors, as well as the ultimate amount of quantum meruit recovery by a discharged attorney, are matters to be resolved by the trial court within the exercise

of its discretion." *Id.* at 577. "One of the central tenets of the *Fox* approach is that a client has an absolute right to discharge an attorney or law firm at any time, with or without cause, subject to the obligation to compensate the attorney or firm for services rendered prior to the discharge." *Reid*, 68 Ohio St.3d at 574. By the plain language of such holdings, allegations the attorney was discharged due to malpractice does not act as an absolute bar to the attorney's suit in quantum meruit. A legal malpractice claim can result in a setoff. Moreover, acts of legal malpractice (and even acts not rising to such level) can be considered in determining the totality of circumstances in the particular case before the court. For instance, the reasonable value of services can be diminished by acts which caused a duplication of services.

{¶47} In *Redmond*, the attorneys sued their clients for fees, the clients counterclaimed for legal malpractice, and the clients argued their former attorneys failed to produce evidence that their legal services provided them with a benefit. The Eighth District explained: "The measure of the benefit provided by the services of the attorneys in a quantum meruit action such as this is measured by the benefit provided to the client. * * * Clients who receive monetary settlements after discharging their attorneys benefit from the services their attorneys performed prior to discharge. The extent to which they benefitted is left to the discretion of the trial judge." *Redmond v. Sberna*, 8th Dist. No. 68529 (May 23, 1996).

{¶48} In the case at bar, the law firm provided evidence that many hours were spent on the clients' case. A reasonable person could find a benefit was conferred upon the clients. For instance, the clients' action against the bank was preserved by the filing of the complaint. Discovery was conducted, even if not completed to the extent originally contemplated. The affidavit of Attorney Apelis said extensive discovery was conducted and included thousands of pages of documents. The clients' claim was further preserved in the counterclaim asserted within the bank's declaratory judgment action after the initial action was voluntarily dismissed without prejudice. The client settled with the bank within three months of terminating the law firm's representation. A reasonable person could find the circumstances suggest it

would be inequitable to find the law firm is not entitled to compensation for any of its legal services.

**{¶49}** For all of these reasons, the law firm's assignment of error has merit as the clients were not entitled to judgment as a matter of law on the law firm's quantum meruit claim. The trial court's entry of summary judgment disposing of the counterclaim is reversed, and the counterclaim is remanded for further proceedings.

<u>LEGAL MALPRACTICE</u>

**{¶50}** The clients set forth the following assignment of error:

"[T]he trial court erred in granting summary judgment in favor of [Attorney Norman] and Gallagher Sharp on the Pipinos' legal malpractice claims against Norman and Gallagher Sharp."

**{¶51}** The elements of a legal malpractice claim are: (1) the attorney owed a duty or obligation to the plaintiff; (2) there was a breach of that duty or obligation and the attorney failed to conform to the standard required by law; and (3) there is a causal connection between the conduct complained of and the resulting damage or loss. *Vahila v. Hall*, 77 Ohio St.3d 421, 674 N.E.2d 1164 (1997). The clients' failure to prove any one of these elements entitles the attorney to summary judgment. *Woodrow v. Heintschel*, 194 Ohio App.3d 391, 2011-Ohio-1840, 956 N.E.2d 855, ¶ 17 (6th Dist.), citing *Greene v. Barrett*, 102 Ohio App.3d 525, 531-533, 657 N.E.2d 553 (8th Dist.1995) (the client must provide evidence on proximate cause to avoid summary judgment in a legal malpractice action). Expert testimony on the causation element is not required in all circumstances, but when there are issues with multiple attorneys, for instance, courts have required expert testimony to show causation. *See, e.g., Van Sommeren v. Gibson*, 6th Dist. No. L-12-1144, 2013-Ohio-2602, 991 N.E.2d 1199, ¶ 32-33, 38 (evaluating the complexity of causation).

**{¶52}** Initially, the clients focus on the element of breach. The clients complain counsel voluntarily dismissed their Mahoning County lawsuit against the bank because he was not prepared to go to trial due to his failure to timely proceed through the discovery process. Attorney Norman's answer to an interrogatory explained an extension was sought due to ongoing discovery disputes and due to the

preference to pursue additional discovery. The case was voluntarily dismissed on April 4, 2012, but the scheduled trial date was still six months away. However, certain documents had not been obtained in discovery, and no expert report was submitted. The trial court denied counsel's motion seeking a further discovery extension, which was not filed until after the previously-extended deadline passed. Specifically, a June 2, 2011 order provided a December 2, 2011 discovery deadline. A January 20, 2012 order resolved several discovery issues and extended the discovery deadline until March 2, 2012. It was not until March 14, 2012 that Attorney Norman moved for an extension of the discovery deadline.

{¶53} At deposition, Mr. Pipino testified Attorney Norman informed him the suit had been dismissed by the trial court. Mr. Pipino said he wanted to immediately refile the suit but Attorney Norman said they should wait until at least July to refile in order to avoid upsetting the court; counsel thereafter recommended the clients proceed to mediation instead of immediately refiling, stating he promised the bank's counsel he would not refile prior to mediation, which was not scheduled until November 2012. This cleared the path for the bank to file a declaratory judgment action in Cuyahoga County the day after mediation. In their appellate brief, the clients say they sued for legal malpractice based on acts relating to the Mahoning County lawsuit. (2/17/17 Br. at 8).

{¶54} The clients point to their expert report by Attorney Engler concluding Attorney Norman breached his duty by violating court orders, failing to inform his clients of the status of the case, failing to follow up on discovery rulings made by the court or timely alert the court of discovery disputes, failing to seek the clients' approval for dismissing the action, and failing to refile the action. The clients conclude the evidence shows a genuine issue of material fact as to whether counsel breached the standard of care, urging a reasonable person could find he committed malpractice.

{¶55} While denying there existed a failure to pursue adequate discovery or other breach, Attorney Norman and the law firm respond that they do not contest a genuine issue existed as to breach. They contend summary judgment was proper

due to the reasons set forth in their summary judgment motion, which revolved around the element of causation.

**{¶56}** Although not always, "the requirement of causation often dictates that the merits of the malpractice action depend upon the merits of the underlying case." *Vahila*, 77 Ohio St.3d at 427-428. In *Vahila*, the claimed malpractice was a failure to properly disclose all consequences surrounding various settlements and plea bargains entered into by the client. Based on the client's theory in that particular case, the Court concluded the client arguably sustained damage or loss regardless of whether he could prove he would have been successful in the underlying matters. *Id.* at 427.

**{¶57}** In a subsequent case, the Court noted the *Vahila* holding implied there are some cases where the client must establish he would have succeeded in the underlying matter. *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 17. The Court then expressly adopted the "case-within-a-case" doctrine, also called the "trial-within-a-trial doctrine," which requires the issues that would have been litigated in the previous action to be litigated between the client and the client's former lawyer, with the client bearing the burden he would have borne as plaintiff in the original trial. *Id.* at ¶ 16, 19. "[I]n considering whether the plaintiff has carried that burden, however, the trier of fact may consider whether the defendant lawyer's misconduct has made it more difficult for the plaintiff to prove what would have been the result in the original trial." *Id.*, quoting Restatement of the Law 3d, Law Governing Lawyers, Section 53, 390, Comment b (2000).

**{¶58}** In *Environmental Network*, the client claimed the attorney's legal malpractice resulted in a coerced settlement on the second day of trial and alleged he would have fared better had the underlying case been tried to conclusion. *Id.* at ¶ 9. The Court distinguished the case (where the sole theory was that a more favorable outcome would have occurred) from *Vahila* (where the client claimed to have sustained the loss regardless of whether the underlying case had merit). *Id.* at ¶ 18. "Thus, the theory of this malpractice case places the merits of the underlying

litigation directly at issue because it stands to reason that in order to prove causation and damages, appellees must establish that appellant's actions resulted in settling the case for less than appellees would have received had the matter gone to trial." *Id.*

**{¶59}** The Supreme Court rejected the trial court's "some evidence" approach, stating it "would eviscerate the established rule that a plaintiff must establish by a preponderance of the evidence that defendant's actions were the proximate cause of plaintiff's losses." *Id.* at ¶ 20. "When a plaintiff is claiming he would have been better off had the underlying matter been tried rather than settled, the standard for proving causation requires more than just some evidence of the merits of the underlying suit." *Id.* at ¶ 21. The Court noted, "[i]nstead of objectively evaluating the validity of [the client's] claims [in the underlying suit], [the client's expert] merely assumed them as fact." *Id.* at ¶ 26. The Court then reversed the jury verdict and entered judgment notwithstanding the verdict for the attorney.

**{¶60}** The clients initially frame their theory of the case as: the legal malpractice diminished the value of their case against the bank. They read the *Environmental Network* decision as implicitly meaning a client does not waive a legal malpractice claim by settling. In response, it is noted said case involved an allegation of a coerced settlement by counsel prompted by his own malpractice. Here, the trial court granted summary judgment on the legal malpractice claim by holding: "the acceptance of the settlement agreement by Plaintiff, which included a release provision, is fatal to the present claims submitted by Plaintiff. Moreover, the 8th District Court holding in *Westerhaus*, is applicable to the facts in the case at bar."

**{¶61}** Attorney Norman and the law firm cite this Eighth District case on appeal in support of their argument that the clients' settlement with the bank after termination of the law firm waived the clients' malpractice claim. This ties in with their other argument that the clients' failed to show the alleged breach of duty proximately caused injury and resulting damages because: the voluntary dismissal was without prejudice; the claims were pending in the Cuyahoga County action at the time of termination; case law provides a loss of venue to a different trial court in the same

state does not establish malpractice where, as here, there was no loss from having to litigate in a different county[2]; no discovery deadlines had been set in the Cuyahoga County case at the time the clients chose to settle; the clients hired new counsel who settled the case rather than take the case to trial; and the prior stage of discovery in a suit voluntarily dismissed without prejudice was irrelevant as new counsel was not prohibited from fully advancing the merits of the suit.

{¶62} The clients cite to the expert report of Attorney Engler who concluded the conduct causing the Mahoning County case to be voluntarily dismissed "resulted in a substantial diminution of the value" of the case against the bank. He said the settlement is merely evidence of mitigation for the $1.3 million total loss (originally incurred as a result of the bank's alleged breach of fiduciary duty). However, he also seemed to be proceeding under the impression that the merits of a malpractice action did not depend on the merits of the underlying action. The report cited *Vahila* for the proposition that there is no need to prove the underlying merits without recognizing the implicit holding in *Vahila* (that some cases *do* implicate the case within a case doctrine) and without citing to the explicit holding in *Environmental Network*. In any event, the clients admit they are required to prove their case within a case to show they would have recovered more (at trial or a bigger settlement) absent the malpractice.

{¶63} On the topic of injury proximately caused by the alleged breach of duty, the expert report did not suggest how the value of the case against the bank was diminished by Attorney Norman. Whether or not an expert was needed on the proximate cause element, summary judgment evidence must establish a loss was proximately caused by the breach of duty. The element of proximate cause cannot be presumed here. The mere presentation of summary judgment evidence that there was breach of a duty by the attorney's performance does not create a presumption that the breach proximately caused a loss. (This is not a strict liability claim.)

---

[2] The clients reply that they do not contend the loss of venue was legal malpractice but rather contend the failure to follow instructions and immediately refile was part of their claim.

{¶64} As an aspect of proximate cause, the premise waiver is also discussed by the parties. In *Sawchyn v. Westerhaus*, a client sued the lawyer who defended him in the punitive damages portion of a tort lawsuit filed against him. After a jury found the client liable for $30,000 in compensatory damages and $216,000 in punitive damages, an appeal was filed. The client sued for malpractice, complaining the lawyer failed to enter settlement negotiations in the tort suit prior to trial. The client then settled the tort action and dismissed the appeal. The lawyer successfully filed a motion for summary judgment in the malpractice action alleging the client waived the malpractice claim by settling the case rather than proceeding through the appeal. The entry of summary judgment was affirmed. *Sawchyn v. Westerhaus*, 72 Ohio App.3d 25, 593 N.E.2d 420 (8th Dist.1991).

{¶65} The Eighth District found the malpractice claim was intertwined with the settlement entered in the underlying action and held: "settlement of the original action prior to completion on appeal has extinguished his rights to hold defendant liable and shields defendant from a subsequent malpractice action. Hence, [the client] has waived his claim in the malpractice action against defendant [attorney]." *Id.* at 29. The *Sawchyn* court believed it would be impossible to calculate the value of the claim due to the settlement and noted the judgment for punitive damages could have been reversed on appeal. *Id.* at 28.

{¶66} The clients cite the Eighth District's subsequent *Monastra* case where the terminated attorney claimed his client waived any malpractice claim against him by allowing her new attorney to settle her divorce case. The client blamed her former attorney for failing to receive temporary alimony and for allowing her husband to deplete the marital accounts; she said counsel made no progress in the case after the complaint was filed. The appellate court rejected the attorney's claim of waiver stating, "the settlement with her husband did not extinguish her claim for legal malpractice as the damages are still calculable and were not extinguished by the settlement." *Monastra v. D'Amore*, 111 Ohio App.3d 296, 302, 676 N.E.2d 132, 136 (8th Dist.1996).

**{¶67}** "If the evidence should show that [the attorney's] defective representation diminished [the client's] ability to reach a successful settlement or succeed at trial, we see no reason why a waiver of that malpractice claim should be implied by reason of the settlement." *Id.* The *Monastra* court distinguished its *Sawchyn* case by finding the settlement and malpractice claim in the latter case were so intertwined they could not exist separately. *See id.*, citing *Sawchyn*, 72 Ohio App.3d 29 and *Estate of Callahan v. Allen*, 97 Ohio App.3d 749, 647 N.E.2d 543 (4th Dist.1994) (finding waiver of malpractice where client, with advice of attorney she later sued, settled her tax issue rather than appealing).

**{¶68}** Attorney Norman and the law firm respond that *Monastra* is distinguishable as the damage from the attorney's malpractice in that case could not be rectified by subsequent counsel, but in the case at bar, the clients did not establish why the new attorney could not proceed to trial or that Attorney Norman's conduct resulted in them having to accept a settlement that was lower than if the case had proceeded to trial earlier. As they lost no opportunity to try their case as a result of Attorney Norman's alleged malpractice, it is asserted that proximate cause is lacking, i.e., there is no evidence to show a causal connection between the amount of settlement or inability to take the case to trial and Attorney Norman's conduct as the case remained pending at the time of his termination with no discovery deadlines. The clients point to their assertion that the settlement ($300,000) was a fraction of their total investment losses without showing how this was proximately caused by Attorney Norman.

**{¶69}** The clients cite to the factual setting of *Environmental Network* as pertinent to the trial court's holding on waiver or lacking proximate cause due to the settlement with the bank. *Environmental Network* dealt with an attorney (who was later accused of malpractice) coercing the clients to settle on the second day of trial rather than proceeding through trial. Again, Attorney Norman and the law firm were not representing the clients when they decided to settle their case against the bank, and the discovery deadlines were not yet set in the case. *Environmental Network*, although involving proximate cause, did not involve a replacement attorney settling

rather than taking the case to trial without an explanation as to why the terminated attorney caused the need to settle or diminished the value.

**{¶70}** The clients are essentially asking this court to hold that delay in a pending case due to counsel's negligence necessarily diminishes the value of a breach of fiduciary duty suit. This is not to say delay can never diminish the value of the underlying suit, but summary judgment evidence must allow a reasonable person to find proximate cause between the delay and the diminished settlement. Here, the bare assertion that counsel's conduct caused loss is mere speculation or assumption. This client is essentially saying, "Because I was tired of dealing with attorneys and the suit I filed, I settled for less than I deserved; the reason I experienced this exhaustion with the process was my prior attorney's delay" (which delay we could assume was a breach for purposes of summary judgment). It is not for this court to theorize how the alleged breach of duty by Attorney Norman could have proximately caused the value of the suit against the bank to diminish.

**{¶71}** The parties also raise the issue of whether the clients' evidence satisfied the case within a case doctrine. The clients are claiming they would have fared better had they proceeded to trial against the bank and would have recovered their total losses at trial. Initially, it should be noted that *Environmental Network* specifically dealt with the situation "when a plaintiff premises a legal-malpractice claim on the theory that he would have received a better outcome if his attorney had tried the underlying matter to conclusion rather than settled it," and the Court held "the plaintiff must establish that he would have prevailed in the underlying matter and that the outcome would have been better than the outcome provided by the settlement." *Environmental Network*, 199 Ohio St.3d 209 at ¶ 2. *See also id.* at syllabus ("When a plaintiff premises a legal-malpractice claim on the theory that he would have received a better outcome if his attorney had tried the underlying matter to conclusion rather than settled it * * *").

**{¶72}** Although the specific factual situation before the Supreme Court involved the same attorney committing malpractice and settling the case, both that situation and the situation in the case at bar involve the client claiming the attorney's

conduct resulted in the settlement and they would have fared better in the absence of the attorney's conduct and/or if they had tried the case. The loss and the extent of the loss are based upon the merits of the underlying action. *Environmental Network* presented one example of the type of malpractice actions that falls under the rubric of the case within the case doctrine mentioned in *Vahila*. *See Environmental Network*, 199 Ohio St.3d 209 at ¶ 14-17, citing *Vahila*, 77 Ohio St.3d at 421-422, 427-428.

> [U]nlike the plaintiffs in *Vahila*, who sustained losses regardless of whether their underlying case was meritorious, [the clients] here could recover only if they could prove that they would have succeeded in the underlying case and that the judgment would have been better than the terms of the settlement. Thus, the theory of this malpractice case places the merits of the underlying litigation directly at issue because it stands to reason that in order to prove causation and damages, appellees must establish that appellant's actions resulted in settling the case for less than appellees would have received had the matter gone to trial.

*Environmental Network*, 199 Ohio St.3d 209 at ¶ 18. *Furthermore, both sides here agree, the case within a case doctrine applies to the clients' malpractice action.*

{¶73} Attorney Norman and the law firm argue the clients did not satisfy their obligation to provide summary judgment evidence on their case within a case. Notably, the client has the same burden as they would have had in the underlying case against the bank. *Environmental Network*, 199 Ohio St.3d 209 at ¶ 16, 19. The case against the bank was for breach of fiduciary duty. It is asserted testimony by a qualified expert was required on the investments in order to avoid summary judgment. Attorney Norman notes the clients provided a report by a certified public accountant, who was their personal accountant, attesting to the total loss from the investments. The accountant stated the bank invested over $2 million in 2009 into leveraged ETFs and the clients lost $1.29 million. The accountant provided a definition of a leveraged ETF, quoting an unnamed source as follows: "an exchange

traded fund that uses financial derivatives and debt to amplify the returns of an underlying index." The accountant added, "It is leveraged by the investor funds and additional funds from the debt. It is a sophisticated and volatile investment instrument." He said the clients were not high risk investors and requested the ETFs be sold when they realized where their assets were invested.

**{¶74}** In moving for summary judgment, Attorney Norman and the law firm noted the accountant's report did not contain an opinion on the standard of care or breach of fiduciary duty in the underlying suit. Attached to the April 20, 2015 motion for summary judgment, was an affidavit stating, "Despite the Court's deadline of February 15, 2015 for Plaintiffs to produce expert reports, Plaintiffs did not submit an expert report opining the First Merit Bank, Jeffrey P. Onuska and/or others breached the standard of care when they allegedly provided Professional financial advice to Plaintiffs relative to investing in exchange-traded funds."

**{¶75}** In responding to the motion for summary judgment, the clients submitted the accountant's affidavit. Attorney Norman and the law firm asked the trial court to strike any new opinions as untimely. They also stated the accountant failed to recite how he was qualified to render an opinion on sophisticated financial products or the standard of care for financial advisers in making investments and trading funds, noting the accountant's affidavit disclosed, "I am not a sophisticated investor and have a basic knowledge of a Traded Fund."

**{¶76}** On appeal, the clients do not contend the accountant provided an expert opinion on breach of the standard of care for financial advisers. Rather, they refer to the accountant's affidavit along with Mr. Pipino's affidavit to prove factual matters. The clients insist these affidavits are sufficient to raise jury questions on the facts, positing expert testimony is not required to prove the bank and the sued employees breached their fiduciary duties to the clients. Mr. Pipino stated: he instructed the bank to make safe and conservative investments; the bank promoted a leveraged ETF as the investment choice; he was not familiar with the product; in response to their recommendation, he reiterated his concern that the trust should contain safe and conservative investments; the bank assured him the suggested

investments were safe and the return would be significant, espousing superior knowledge; and he consented to the investments. Mr. Pipino concluded the recommendation was contrary to his directives on investment strategy. He said the bank's advice was false and violated the bank's duty to avoid volatile, high risk investments and the bank knew or should have known leveraged ETFs were not suitable investments.

**{¶77}** He attached two articles to his affidavit. One is entitled, "SEC official suggests new label for leveraged ETFs" and states leveraged ETFs "require greater deal of disclosure and up-front work with the client for them to understand the investment and the structural risks and BlackRock believes that they should not be labeled ETFs." As stated in a motion to strike, the articles are not incorporated into the affidavit and cannot substitute for expert testimony.

**{¶78}** The clients acknowledge their claim against the bank was for breach of fiduciary duty, stating a fiduciary relationship exists between a financial advisor and his clients. *Citing Byrley v. Nationwide Life Ins. Co.*, 94 Ohio App.3d 1, 18, 640 N.E.2d 187 (6th Dist.1994) ("A broker and client are in a fiduciary relationship and, therefore, the broker owes the client a duty to disclose material information concerning investments."). The clients conclude the dispositive issues are whether the bank followed the clients' instructions and made full disclosures to the clients. The clients urge the answers to these questions are "within the ordinary, common, and general knowledge of mankind." They cite the *Ramage* case, which outlined the "common knowledge exception" as follows: "Under this exception, matters of common knowledge and experience, subjects which are within the ordinary, common and general knowledge and experience of mankind, need not be established by expert opinion testimony." *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 103, 592 N.E.2d 828 (1992).

**{¶79}** In *Ramage*, the Court stated expert testimony is not only needed to prove medical malpractice by a physician but also to prove the standard of care for a nurse exercising professional skill and judgment. *Id.* at 102-103. The plaintiff asked the Court to apply the common knowledge exception to the nurse's conduct. In

refusing to apply the exception, the Court distinguished cases applying the exception where the "allegations were claims of ordinary negligence" as opposed to the case before it where the allegations "go to the professional skill and judgment of the nurses—matters not within the common knowledge and experience of the jurors." *Id.* at 103. "Where the alleged negligence involves the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury." *Id.* at 103-104.

{¶80} Attorney Norman and the law firm respond by arguing a qualified expert was required to prove breach of the standard of care for a financial professional. They cite a Supreme Court case requiring expert testimony show medical malpractice. *See Berdyck v. Shinde*, 66 Ohio St.3d 573, 579, 613 N.E.2d 1014 (1993) ("Whether negligence exists is determined by the relevant standard of conduct for the physician. That standard is proved through expert testimony."). In claiming expert testimony is needed to show professional malpractice of a financial adviser, they cite a case holding it was necessary to establish the standard of care of an insurance agent through expert testimony in order to avoid summary judgment. *See MBE Collection, Inc. v. Westfield Cos., Inc.*, 8th Dist. No. 79586 (Apr. 18, 2002). Notably, the *Byrley* case cited by the clients found evidence to avoid summary judgment or directed verdict on the breach of fiduciary claim against the broker where the plaintiff obtained an expert opinion on the investment advice. *Byrley*, 94 Ohio App.3d at 13-14. Attorney Norman and the law firm conclude the financial advice relative to investing in ETFs or leveraged ETFs and whether the bank breached its standard of care in so advising is clearly beyond the common knowledge of a layperson.

{¶81} Notably, the clients' expert report on Attorney Norman's malpractice contained an opinion on Attorney Norman's failure to provide an expert report to the bank by the deadline in the Mahoning County action:

> It would have been imperative that the Plaintiffs hired an expert, and produced an expert report showing that Defendants [bank and

employees] were negligent, reckless and without authority to make the investments in the Trusts which led directly to the 1.3 Million Dollar loss. The allegation was that the type of investment was risky and not well suited for the needs of the Trusts where the main fiduciary concern was safety of the investment. First Merit invested trust funds into speculative products. No report was ever produced. This was a direct violation of the Court's order and without such a report the case could not go forward.

Consequently, the clients' own expert on legal malpractice was opining an expert affidavit on breach of fiduciary duty was required in the underlying action.

**{¶82}** In their reply brief, the clients claim an attorney who files a lawsuit against a bank for breach of fiduciary duty necessarily admits there was a breach of fiduciary duty by the mere filing of the lawsuit, citing e.g., Civ.R. 11. However, this was not specified in the clients' initial brief, and this position would seem to eviscerate the case within a case doctrine. If the original filing of the suit for the clients by counsel constitutes an admission in a later malpractice case and thereby satisfies the case within a case doctrine, then the *Environmental Network* Court would not have reversed a jury verdict due to the lack of evidence on the merits of the underlying lawsuit filed by the attorney now being sued by his clients. This court concludes the clients breach of fiduciary duty claim required qualified expert testimony in order to satisfy the case within the case doctrine (as to the allegation that the legal malpractice caused the case to diminish in value).

**{¶83}** Alternatively, on the concept of whether any loss was proximately caused by the malpractice, there is a suggestion the clients, at least, sufficiently showed damages were proximately caused by malpractice due to loss of use of the money during the delay caused by Attorney Norman. Attorney Engler's report stated the malpractice-induced delay in resolving the case could be seen as causing damage for loss of use of the money they would have received sooner but for the malpractice. The clients believe this premise is supported by *Paterek*.

**{¶84}** The circumstances existing in this case, however, do not support the clients' contention. Whether the trial against the bank would have proceeded in October 2012 as scheduled is speculative. Additionally, the clients settled the case against the bank in September 2013. This settlement was much more ($200,000 more) than the bank's offer at mediation in November 2012. Moreover, the loss of use of the money (money alleged to be unavailable for future investment as a result of the bank's breach of fiduciary duty) can be considered part of the settlement. Finally, the portion of *Paterek* relied upon by the clients must be read in context of the case before the Court.

**{¶85}** The clients rely on the following statement: "courts need not—and should—overlook the possibility of settlement or the passage of time in determining damages suffered by a malpractice plaintiff." *Paterek v. Petersen & Ibold*, 118 Ohio St.3d 503, 2008-Ohio-2790, 890 N.E.2d 316, ¶ 38. In that case, the attorney voluntarily dismissed the client's suit against a motorist and failed to refile the suit within one year, causing the clients to lose the ability to bring their cause of action. In the malpractice action, *the parties stipulated there was merit to the underlying suit against the motorist; they also stipulated the attorney was liable for damages proximately caused by the dismissal with prejudice. Id.* at ¶ 3, 9. The only issue at trial was the amount of damages. *Id.* at ¶ 15. The trial court reduced the jury award to the tortfeasor's $100,000 liability policy, even though the clients had $250,000 in underinsured motorist coverage. *Id.* at ¶ 17. The appellate court reversed, finding the clients were not required to show collectability. *Id.* at ¶ 23-24. The issue before the Supreme Court was "whether the collectability of any judgment that might have resulted from the lost claim is relevant to calculating the malpractice damages." *Id.* at ¶ 29.

**{¶86}** The *Paterek* Court stated the answer was implicit within the *Vahila* holding "that there must be a causal connection between the conduct complained of and the resulting loss." *Id.*, citing *Vahila*, 77 Ohio St.3d at syllabus. The Court pointed out the attorney who commits malpractice is not liable for the underlying tortfeasor's conduct but is only liable for his own conduct. *Paterek,* 118 Ohio St.3d

503 at ¶ 30 ("The proper inquiry, then, is this: Had the appellants not been negligent, how much could Irene have received from a settlement or a judgment?").  The Court then expressly adopted the prevailing view that the client's recovery from an attorney for malpractice is limited to the amount which would have been collectable and the client has the burden to prove the claimed amount of damages was collectable.  *Id.* at ¶ 32, 39.

**{¶87}**  In doing so, the Court reviewed the minority position, which holds non-collectability is an affirmative defense which can be raised by the attorney, but it is not an element of the client's case.  *Id.* at ¶ 33-34.  The Court noted:  "Moreover, this minority has criticized the majority position because it ignores the possibility of settlement between the plaintiff and the underlying tortfeasor and also overlooks that the passage of time itself can be a militating factor either for or against collectability of the underlying case."  *Id.* at ¶ 34, quoting *Kituskie v. Corbman*, 552 Pa. 275, 285, 714 A.2d 1027 (1998) (which took this passage from *Smith v. Haden*).  The *Paterek* Court also quoted and disagreed with *Smith v. Haden*, 868 F.Supp. 1, 2 (D.D.C.1994) (which stated the plaintiff is only required to prove loss of a judgment on a valid claim).  An underlying holding in *Smith* was as follows:

> To also require a plaintiff to show the degree of collectability of a judgment in a legal malpractice case is subject to criticism on several grounds. For example, it wholly ignores the possibility of a settlement between plaintiff and the potential defendant, either before or after judgment, which may be encouraged by active litigation of a claim. * * * In addition, the passage of time itself can be a significant factor militating either for or against the collectability of a judgment. It is not without significance that a judgment is valid for many years. * * * In this case, for example, it may be that [the original defendant's] financial situation has improved since he declared bankruptcy or that, as Plaintiff suggests, as a matter of law Plaintiff's judgment would not be a dischargeable debt, thereby giving Plaintiff a preference over a discharge creditor whose debt has been reaffirmed.  [Citations omitted.]

*Smith*, 868 F.Supp. at 2.

**{¶88}** As can be seen, the holding in *Paterek* was made in the context of addressing the question of whether collectability of a judgment against the original defendant is part of the client's malpractice action when the attorney caused the client to "lose" the action against the original defendant. Passage of time referred to the fact that a defendant may have been uncollectable but is now collectable or vice versa. Likewise, the ability to consider that the clients may have entered a settlement with the original defendant (before or after judgment) was a reference to the considerations in evaluating collectability. The Court was referring to the possibility of a settlement that never materialized due to the dismissal of the lawsuit with prejudice and the collectability of such a settlement. The Court did not suggest the mere passage of time due to delay caused by an attorney automatically means damages were proximately caused due to the temporary loss of use of money thereafter collected in a settlement. Nor did the Court issue a holding where a client settles a case after terminating an attorney and sues the attorney for malpractice without explaining how the attorney diminished the value of the underlying case where the case still remained pending and awaiting trial with discovery deadlines yet to be set. For all of the foregoing reasons, this court upholds the grant of summary judgment entered against the clients on their legal malpractice claim.

**{¶89}** In conclusion, as to the law firm's appeal, we hereby reverse summary judgment entered against the law firm on its quantum meruit counterclaim, and remand for further proceedings on the counterclaim. As to the clients' appeal, we affirm the grant of summary judgment entered against the clients on their legal malpractice claim.

Donofrio, J., concurs.

Waite, J., concurs.