[Cite as *John D. Smith Co., LPA v. Lipsky*, 2020-Ohio-3985.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

|  |  |  |
|---|---|---|
| JOHN D. SMITH CO., L.P.A. | : | |
| | : | Appellate Case No. 2019-CA-65 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2017-CV-460 |
| v. | : | |
| | : | (Civil Appeal from |
| DANIEL S. LIPSKY, et al. | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of August, 2020.

. . . . . . . . . .

JOHN D. SMITH, Atty. Reg. No. 18138 & ANDREW P. MEIER, Atty. Reg. No. 0083343, 140 North Main Street, Suite B, Springboro, Ohio 45066
     Attorneys for Plaintiff-Appellee

ANDREW R. MAYLE, Atty. Reg. No. 0075622, P.O. Box 263, Perrysburg, Ohio 43552
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Daniel S. Lipsky appeals from a judgment of the Greene County Court of Common Pleas, which awarded $66,427.74 plus interest to John D. Smith Co., LPA, for unpaid professional services fees, pursuant to a jury verdict. Lipsky also appeals the subsequent denial of his motion for a new trial. For the following reasons, the trial court's judgments will be affirmed.

## I. Factual and Procedural History

{¶ 2} At trial, Attorney John D. Smith was the sole witness on behalf of John D. Smith Co., LPA ("the Smith Firm"). Lipsky testified on his own behalf, and he also called Sherry Ann Scott, Vice President of Administration for Nationwide Biweekly Administration, Inc. ("NBA"), to testify. A summary of the evidence is as follows.

{¶ 3} Smith is an attorney licensed in the state of Ohio since 1980. He also has been admitted to practice in the Southern District of Ohio, the Sixth Circuit Court of Appeals, and the United States Supreme Court. Smith has been admitted to practice pro hac vice in other state and federal courts. At all relevant times, Smith was the sole shareholder of the Smith Firm, a firm with ten employees, located in Springboro, Ohio.

{¶ 4} Lipsky is the president and sole shareholder of NBA, a company that assists clients with making biweekly mortgage payments. NBA's corporate offices are located in Xenia, Ohio. During the relevant time, Lipsky consulted with Sherry Ann Scott and Barbara Bison Jacobson, long-standing outside counsel for NBA, over various matters pertaining to litigation involving NBA.

{¶ 5} In January 2016, Lipsky, individually, hired the Smith Firm to represent him in a post-decree divorce matter. The engagement letter included enumerated sections

discussing (1) what Lipsky could expect from the firm, (2) what the firm expected from him, (3) the hourly rates for Smith, other attorneys with the firm, and paralegals, (4) that Lipsky was responsible for litigation costs and expenses, (5) the payment of a retainer and invoicing for services, (6) client files and records, (7) withdrawal from representation, (8) appeals and other related proceedings, and (9) the granting of a lien on monies due. (Def.'s Ex. B.)

{¶ 6} The following month, the Smith Firm agreed to represent NBA and an NBA employee in a discrimination action in the federal district court in Dayton. Lipsky signed a more abbreviated engagement letter (Def.'s Ex. C), which indicated that the Smith Firm would be substitute counsel in the action and that the firm would be reviewing the joint representation documents between the employee and the company to ensure no conflict of interest. The engagement letter also provided the hourly rates for firm personnel, requested a retainer, and indicated that the firm would present monthly itemized bills, which it requested to be paid within 15 days of receipt.

{¶ 7} Several months later, Lipsky and Smith discussed the Smith Firm's representation of NBA and Lipsky individually in two actions against them in California, one in federal court in San Francisco and one in state court. The state action was brought by the California Department of Business Oversight; the federal action was brought by the federal Consumer Financial Protection Bureau. Both actions alleged, in essence, that NBA employed deceptive marketing strategies.

{¶ 8} On July 8, 2016, Smith sent a letter to NBA and Lipsky, detailing the terms and conditions of his firm's representation of Lipsky and NBA in the California cases. Smith emphasized in his testimony that Lipsky had been sued individually and that the

engagement letter "clearly indicates that I'll be representing both [Lipsky] and NBA" in the litigation.   (Tr. at 228.)

{¶ 9} The engagement letter indicated that the Smith Firm would be assisting Sean Ponist, an attorney licensed in California who had already been retained by NBA and Lipsky to work on the pending lawsuits.   Smith reduced his hourly rate from $350 to $300 to match Ponist's hourly rate; Smith's associates would be paid at $200 per hour and paralegals at $85 per hour.   The engagement letter addressed litigation costs, stating: "[W]e will keep each other posted of litigation costs, such as travel and whatnot, make agreements prior to expending same, and move forward."   Smith testified that clients were responsible for paying Smith's plane tickets, hotel lodging, office expenses, and other expenses due to case-related travel.   Clients also were responsible for other litigation expenses, such as court reporter fees for depositions.   As to the payment of the Smith Firm's fees, the July 8 engagement letter stated: "As with our past practice, we will continue to bill monthly with itemized statements, holding the $10,000.00 security deposit in Trust with the company paying its bills on a monthly basis upon receipt of the invoices."

{¶ 10} With Ponist's sponsorship, Smith was admitted pro hac vice to practice in the relevant California courts.   The engagement letter indicated that Smith and Ponist would divide the work, and Smith testified that he and Ponist did so "in a way that was kind of like east of the Mississippi and west of the Mississippi."   (Tr. at 237.)   Ponist handled the filing of documents and information requests in state court while Smith handled federal court.   Ponist obtained all the experts, but Smith defended the depositions if they were on the East Coast.

{¶ 11} Throughout 2016, NBA regularly paid the Smith Firm's invoices in full,

although it missed a payment in April 2016. The Smith Firm's invoices (Pl.'s Ex. 6; Def.'s Ex. A) reflect the following payment history:

| Invoice Date | Invoice Amount | Date Paid | Amount, if not in full |
| --- | --- | --- | --- |
| 3/2/2016 | $365.00 | 3/11/2016 | |
| 4/1/2016 | $1,118.25 | 5/16/2016 | |
| 5/10/2016 | $1,038.00 | 5/16/2016 | |
| 6/1/2016 | $2,415.66 | 6/22/2016 | |
| 7/5/2016 | $12,675.75 | 7/18/2016 | |
| 8/8/2016 | $12,095.80 | 8/15/2016 | |
| 9/6/2016 | $29,444.93 | 9/19/2016 | $29,419.43 |
| 10/4/2016 | $23,210.11 | 10/24/2016 | |
| 11/1/2016 | $38,154.50 | 11/21/2016 | |
| 12/1/2016 | $34,625.81 | 1/4/2017 | |
| 1/9/2017 | $57,988.48 | 1/13/2017 | |

As of January 13, 2017, NBA's account with the Smith Firm was current.

{¶ 12} However, toward the end of 2016, Lipsky's assets were becoming depleted. Smith testified that, in January 2017, Lipsky told him that he (Lipsky) had $500,000 remaining to expend on litigation. Lipsky agreed that he told Smith that he had $500,000 left, but asserted that the conversation occurred in November 2016. Lipsky asserted at trial that the Smith Firm's failure to take into account Lipsky's financial condition was a breach of fiduciary duty.

{¶ 13} On February 2, 2017, the Smith Firm emailed an invoice for $49,944.49, representing work performed in January. NBA did not send any payment in February 2017.

{¶ 14} In late February 2017, Smith travelled to New York to defend the deposition of an expert. After the deposition, Smith communicated with Lipsky and recommended that NBA fly that expert to California to testify in person at trial. Trial in the federal action

was scheduled for April 24, 2017.

{¶ 15} On March 2, the Smith Firm emailed an invoice for $28,732.50 for professional services rendered in February. The same day, Lipsky mailed correspondence on NBA letterhead to Smith, thanking him and his firm for "work[ing] tirelessly" on the California litigation and requesting a new payment agreement for the firm's invoices. (Pl. Ex. 2; Def.'s Ex. G.) Lipsky wrote, in part:

First, I am not able to replenish the $10,000 retainer fund. In addition, we need to do the following:

Payment on the February, 2017 invoice of $25,000 today with payment of the remaining approximate $25,000 balance plus 20% as soon as funds are available after the April 24 CFPB trial.

Payment on the subsequent 2017 invoices of 50% of the charges with payment of the remaining 50% plus an additional 20% of that balance payable as soon as funds are available after the April 24 CFPB trial.

We have no doubt that we are going to be victorious.

Also, I want to let you know that I am reaching out to possible sources of additional funding that are intended to keep us afloat and to provide funding for our legal battle. This may allow me to modify the above arrangement and I will keep you informed about our progress as we go along in that process. In the meantime, however, please consider the above proposal.

Lipsky enclosed a $25,000 check from NBA to the Smith Firm.

{¶ 16} Lipsky also emailed Ponist on March 2 about altering the payment

agreement with Ponist's firm. Ponist responded by email on March 3 that he would consider Lipsky's proposal; Ponist attached an invoice for services rendered in February. (Ponist was owed $119,655.77.)

{¶ 17} On March 5, Smith had a conversation with Jacobson (long-standing outside counsel for NBA) about Lipsky's letter, which Smith had not yet received. Smith testified that this conversation was odd, because his communications primarily were by email at that point.

{¶ 18} On March 6, Smith sent a letter to Lipsky, detailing the upcoming pretrial conferences and trial dates, attaching the March invoice for February expenses, and stating what payments were necessary for Smith's work to proceed. Specifically, Smith wrote:

> Our original agreement was that the monthly bills would be paid timely. This has not occurred. I am unable to proceed without all bills being current and a deposit/retainer for the Trial and the March bill to be paid in the amount of $125,000.00. The retainer will be placed in Trust and accounted for as we move forward. This arrangement needs to take place this week.

Smith further wrote that he and Lipsky needed to discuss lodging and other travel expenses for the March 23 pretrial conference and April trial. (Pl.'s Ex. 7, Def. Ex. H.)

{¶ 19} On March 8, Ponist responded by mail and email to Lipsky's March 2 correspondence; Smith was copied on the response. Ponist provided a counter-proposal that Lipsky immediately pay the balance due to his firm and wire by March 15 the amount of $337,500, to be held in trust and from which $67,500 per month would be

withdrawn until all actual fees were paid in full.

{¶ 20} That evening, Lipsky replied by email to Ponist, copying Smith, Jacobson, and Scott. Lipsky stated that he had $250,000 left to his name, with personal monthly expenses of $36,000 and net non-legal company expenses of $60,000 per month. Lipsky indicated that monthly legal expenses averaged $130,000. He estimated that his money would be gone in two months. He stated, however, that he was due a $1.19 million federal tax refund, and his accountant anticipated its receipt by June 1. (Lipsky's Exhibit E shows that this was a refund of his personal taxes, not NBA's corporate taxes.) Lipsky concluded by stating that he did not "have any idea what I'm supposed to do." Approximately an hour later, Lipsky wrote to Ponist, offering two sports cars as payment.

{¶ 21} Around noon on March 9, Lipsky wrote Ponist, copying Smith and Jacobson, that he had sold his last rental property and would have an additional $160,000 in 30 days. Ponist responded that evening that his firm was not interested in being compensated through cars or other goods and that his firm's counter-proposal had not changed.

{¶ 22} Smith testified that he received Lipsky's March 2 letter on March 8, and he spoke with Lipsky on March 9. Smith testified:

> [Lipsky] was cheerleading a bit about the case, and it was basically in an effort to get me to say, I would go do this and get paid later. And I was telling Dan, I, I can't do that. It wasn't that I didn't want to do it, but I did explain to him that I had a wife and three children and ten employees, and I relied on the agreement that we made and that was the only way that I could make this work.

(Tr. at 253.)   Smith stated that Lipsky proposed terminating his agreement with Ponist so that Smith could be paid more.   Smith rejected that proposal and told Lipsky that he would be informing Ponist of Lipsky's proposal.   After the conversation ended, Smith spoke with Ponist, who told Smith that Lipsky had made a similar offer to him (Ponist).

{¶ 23} The next day (March 10), Smith and Ponist jointly prepared and filed in the federal court in California a motion to withdraw.   (Pl.'s Ex. 3)   Smith's informed the California court that Lipsky and NBA had breached their agreements and obligations to counsel by failing to pay fees and continuing to do so.   Lipsky claimed at trial in this case that the Smith Firm breached its agreement with Lipsky and NBA, depriving them of the firm's services at the April trial in California.

{¶ 24} The same day as the motion to withdraw was filed, Smith was contacted by Attorney Helen Mac Murray, who had provided legal services for NBA previously, regarding the transfer of the California case files to her office.   Smith's paralegal began to download information that day.   During the next week, Smith participated in joint pretrial conferences with opposing counsel in the federal case and conference calls with Mac Murray's office to assist in a smooth transition.   On March 16, Lipsky filed a response to the motion to withdraw, indicating that he had obtained new counsel.   (Pl.'s Ex. 4.)   The magistrate judge in the federal case permitted Smith to withdraw on March 17.   (Pl.'s Ex. 5.)

{¶ 25} On March 31, the Smith Firm emailed an invoice to NBA for an additional $15,270.50 for charges accrued in March, plus the previous balance.   That invoice reflected that the firm had applied Lipsky's $25,000 check and the $10,000 retainer toward the balance due.   The total balance due as of March 31, representing charges

through March 17, was $59,517.80.

{¶ 26} The Smith Firm's May 1, 2017 invoice included $287.50 for work performed by an associate on April 20, as well as $440.30 for research done in January through March. Each month, the Smith Firm charged interest on the unpaid balance. Smith's most recent invoice before trial sought $66,427.74, which was the amount due as of July 1, 2019. Smith testified that, based on his professional experience, all of the charges were reasonable and necessary. He further testified that the invoices represented the value of his services.

{¶ 27} On July 18, 2017, the Smith Firm brought the instant lawsuit against Lipsky and NBA for unpaid professional services fees in the amount of $60,398.90 (the amount due as of May 1, 2017), plus interest. Lipsky and NBA denied the allegations and asserted a counterclaim and third-party claim against Smith individually for breach of fiduciary duty. Lipsky and NBA subsequently voluntarily dismissed their counterclaim and third-party claim.

{¶ 28} In May 2019, counsel for Lipsky and NBA withdrew, and the court granted 30 days for those parties to obtain new counsel. Lipsky asked the trial court for permission to represent NBA. The trial court denied his request, stating that a corporation could not appear in court through an officer or appointed agent who was not admitted to the practice of law. The court indicated Lipsky could represent himself as to the claim against him personally. NBA appealed the trial court's ruling,[1] and Lipsky

---

[1] Lipsky filed the notice of appeal on NBA's behalf. *See John D. Smith, Co., LPA v. Lipsky*, 2d Dist. Greene No. 2019-CA-45. On August 5, 2019, this court dismissed the appeal, because Lipsky's filing was "ineffective." We reasoned that, in Ohio, non-attorneys generally cannot file on behalf of other parties, even when the filing is by a corporate officer on behalf of the corporation. NBA appealed our judgment to the Ohio Supreme

requested a continuance of the trial date; that request was denied.

{¶ 29} On August 6, 2019, the matter proceeded to a jury trial on the claims against Lipsky only. Lipsky represented himself at trial, and Smith represented his law firm. After deliberations, the eight-member jury unanimously found in favor of the Smith Firm in the amount of $66,427.74, the amount requested at trial. Lipsky filed a motion for a new trial, pursuant to Civ.R. 59. The trial court overruled the motion.

{¶ 30} Lipsky appeals from the trial court's judgments, raising two assignments of error. Although Lipsky has appealed from the denial of his motion for a new trial, neither of his assignments of error relates to the denial of that motion. Accordingly, we affirm, without discussion, the denial of his motion for a new trial, and we will confine our discussion to the two issues raised related to the judgment following the jury's verdict.

## II. Terms of the Parties' Contract

{¶ 31} Lipsky's first assignment of error states:

The verdict against Lipsky individually is (a) not supported by sufficient evidence and (b) against the manifest weight of the evidence because the law firm's engagement contract stipulates that "the company," i.e., Nationwide Biweekly Administration, Inc., will pay the firm's invoices. Nothing states that Lipsky shall individually pay if the company does not. Thus, the law firm's sole remedy is against the company.

{¶ 32} In a civil case, in which the burden of persuasion is only by a preponderance

---

Court. *John D. Smith, Co., LPA v. Lipsky*, Case No. 2019-1087. In November 2019, the supreme court declined to accept jurisdiction over the appeal. *11/26/2019 Case Announcements*, 2019-Ohio-4840. It appears that the Smith Firm's claim against NBA remains pending.

of the evidence, evidence must exist on each element of the claim (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight). *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.

{¶ 33} The manifest weight standard of appellate review used in *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), applies in both civil and criminal cases. *Eastley* at ¶ 17. When reviewing an argument challenging the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment should be reversed as being against the manifest weight of the evidence only in exceptional cases. *Martin* at 175.

{¶ 34} Where an appellate court determines that a jury verdict is not against the manifest weight of the evidence, the verdict is necessarily based on legally sufficient evidence. *See, e.g., State v. Webber*, 2015-Ohio-2183, 35 N.E.3d 961, ¶ 9 (2d Dist.).

{¶ 35} The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is

within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). *See also Bayes v. Dornon*, 2015-Ohio-3053, 37 N.E.3d 181, ¶ 53 (2d Dist.); *Individual Business Servs. v. Carmack*, 2d Dist. Montgomery No. 25286, 2013-Ohio-4819, ¶ 20.

**{¶ 36}** The Smith Firm alleged that NBA and Lipsky breached their contract by failing to pay the fees for professional services received in January, February, and March 2017. "A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976).

**{¶ 37}** The parties agree that they entered into a contract on July 8, 2016, in which the Smith Firm agreed to represent both NBA and Lipsky in the California litigation. The crux of Lipsky's argument on appeal is that the terms of the contract between the parties placed the responsibility for payment for the Smith Firm's services solely on NBA. Lipsky claims that the Smith Firm thus agreed that NBA would pay for the firm's representation of Lipsky. The Smith Firm responds that the engagement letter specifically indicated that the Smith Firm would represent both NBA and Lipsky and that Lipsky signed the engagement letter without any corporate designation that would eliminate or limit his personal responsibility for payment of the fees. The Smith Firm argues that Lipsky was, therefore, contractually liable for the unpaid legal fees and the jury's verdict was not against the manifest weight of the evidence.

{¶ 38} "Generally, a party signing a contract as a corporate officer is not individually liable." *Spicer v. James*, 21 Ohio App.3d 222, 223, 487 N.E.2d 353 (2d Dist.1985), citing *Centennial Ins. Co. of New York v. Vic Tanny Internatl. of Toledo, Inc.*, 46 Ohio App.2d 137, 140-142, 346 N.E.2d 330 (6th Dist.1975); *see also, e.g., Herhold v. Smith Land Co.*, 9th Dist. Summit No. 28915, 2019-Ohio-2418, ¶ 46. "However, if a corporate officer executes an agreement in a way that indicates personal liability, then that officer is personally liable regardless of his intention. * * * Whether a corporate officer is personally liable upon a contract depends upon the form of the promise and the form of the signature." *Spicer* at 223.

{¶ 39} In *Spicer*, corporate officers twice signed a lease which named the company as the tenant: their first set of signatures did not have any corporate designation, and their second set of signatures had their corporate titles after their names. We concluded that, despite naming only the company as tenant, the signatures indicated that the corporate officers were individually liable. We explained:

Although the body of the lease agreement was in the singular form and listed only Elegant Imports, Inc. as the tenant, appellants' signatures must be interpreted not only as binding the corporation to the terms of the lease but also as binding appellants as individuals. There is no language preceding the individual signatures that would indicate appellants signed the lease agreement "on behalf of" or "per" Elegant Imports, Inc. Therefore, the signatures which appeared without appellants' corporate title indicate that appellants signed the lease agreement in an individual capacity. * * *

*Id.*

**{¶ 40}** Other courts have similarly held that a "[t]he typical format to avoid individual liability is company name, individual's signature, individual's position." *The Big H, Inc. v. Watson*, 1st Dist. Hamilton No. C-050424, 2006-Ohio-4031, ¶ 7, citing *Aungst v. Creque*, 72 Ohio St. 551, 556, 74 N.E. 1073 (1905) and *Ohio Natl. Bank v. Cook*, 38 Ohio St. 442, 444 (1882); *see also, e.g., Hubbard Family Tr. v. TNT Land Holdings, LLC*, 2014-Ohio-772, 9 N.E.3d 411, ¶ 38 (4th Dist.); *Lamar Advantage GP Co. v. Patel*, 12th Dist. Warren No. CA2011-10-105, 2012-Ohio-3319, ¶ 19.

**{¶ 41}** Here, Lipsky signed the engagement letter without any designation by his signature that he was signing for NBA. He did not provide his corporate title by his signature or otherwise indicate that he was signing only in a corporate capacity. Accordingly, Lipsky signed the engagement letter in such a way that he exposed himself to individual liability.

**{¶ 42}** Lipsky emphasizes that other portions of the engagement letter nevertheless demonstrate that NBA accepted sole responsibility for paying the Smith's Firm's legal bills. He first notes that the engagement letter was addressed to Lipsky at NBA's corporate address and identified Lipsky as President and CEO of NBA. In this case, the addressee section has less relevance, given that the engagement letter governed the representation of both Lipsky individually and NBA. The fact that the engagement letter was sent to Lipsky at his business address (NBA's corporate offices) does little to clarify whether he was signing the engagement solely on behalf on NBA or, instead, was also personally liable.

**{¶ 43}** Lipsky focuses on the language in the engagement letter that addresses the

payment of invoices. That portion states: "As with our past practice, we will continue to bill monthly with itemized statements, holding the $10,000.00 security deposit in Trust with *the company paying its bills* on a monthly basis upon receipt of the invoices." (Emphasis added.)

**{¶ 44}** It is true that "the contract terms can override the signature." *Orum Stair, LLC v. GJJG Ents., LLC*, 2016-Ohio-7064, 72 N.E.3d 190, ¶ 32 (10th Dist.). "Where it is apparent from the [contract] 'that the true object and intent of its execution is to bind the principal, and not the agent, courts will adopt that construction of it.' " *Id.*, quoting *Aungst*, 72 Ohio St. at 555, 74 N.E. 1073.

**{¶ 45}** The engagement letter's terms indicate, as Lipsky states, that invoices would be sent to NBA and the expectation was that NBA would pay the invoices. However, the agreement provided for the Smith Firm's representation of NBA *and* Lipsky (the company's sole shareholder), and the agreement did not expressly provide that NBA would be solely responsible for payment of all attorney fees and litigation expenses. In short, we disagree with Lipsky that the language of the contract overrode Lipsky's signature, which rendered him individually liable.

**{¶ 46}** Even if we were to conclude that the engagement letter were ambiguous, thus allowing consideration of parol evidence to resolve whether Lipsky was individually liable, the jury's determination that Lipsky was liable would not be against the manifest weight of the evidence. Unlike the engagement letter at issue in the California litigation, the engagement letter from the Smith Firm regarding the discrimination matter was signed by Lipsky with the following signature line: "Mr. Daniel Lipsky, President and CEO, Nationwide Biweekly Administration, Inc." (Def.'s Ex. C.) Lipsky's evidence thus

indicated that he previously had signed an agreement with the Smith Firm in a representative capacity only, and his failure to do so with respect to the California litigation, where he individually also was a client, suggested that he understood that he was signing the engagement letter in both a representative and an individual capacity.

{¶ 47} Lipsky's communications with Smith and Ponist as his assets became more limited also made clear that he was using personal assets to fund the California litigation. According to Lipsky, he informed Smith in November 2016 that his assets were being depleted by the litigation.  On March 8, 2017, he emailed his attorneys and detailed "exactly what money I have left to my name," as well as his personal and corporate monthly expenses.  (Def.'s Ex. N.)  He stated that he had "sold off most of [his] assets." (*Id.*)  Lipsky stated that he would be receiving a sizeable tax refund, and he had approached the bank about getting an advance loan on that income; Lipsky's evidence indicated a personal tax refund of $1.19 million (*see* Def.'s Ex. E).  In a separate email, Lipsky offered to pay Ponist with two sports cars that he owned.  The next day, Lipsky emailed his attorneys that he accepted an offer to sell a rental home that he owned and would be receiving $160,000.  Based on Lipsky's evidence, the jury could have reasonably concluded that, although invoices were sent to NBA and paid by NBA, the parties understood that Lipsky would be using his personal assets to ensure payment of the Smith Firm's invoices.

{¶ 48} Lipsky's first assignment of error is overruled.

### III. Quantum Meruit

{¶ 49} Lipsky's second assignment of error states:

The trial court erroneously instructed the jury on the alternate theory of

*quantum meruit*, or unjust enrichment.

**{¶ 50}** In his second assignment of error, Lipsky claims that the trial court should not have instructed the jury on quantum meruit, because the issue of payment of the law firm's fees was governed solely by the parties' express contract, and quantum meruit applies only after a firm has been discharged, i.e., when no contract exists. Lipsky notes that the Smith Firm never raised quantum meruit in its complaint.

**{¶ 51}** "Recovery in quantum meruit is based upon the law of quasi-contract or implied contract." *Pipino v. Norman*, 2017-Ohio-9048, 101 N.E.3d 597, ¶ 41 (7th Dist.), citing *Legros v. Tarr*, 44 Ohio St.3d 1, 7, 540 N.E.2d 257 (1989). "A quasi-contract is a contract implied so as to prevent injustice. * * * It is a legal fiction that does not rest upon the intention of the parties, but rather on equitable principles in order to provide a remedy." *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged*, 15 Ohio St.3d 44, 46, 472 N.E.2d 704 (1984).

**{¶ 52}** We have explained the equitable remedy of quantum meruit, stating:

> Quantum meruit means "as much as deserved." *Sonkin & Melena Co., L.P.A. v. Zaransky* [ ], 83 Ohio App.3d 169, 175[, 614 N.E.2d 807 (8th Dist.1992)]. "[Q]uantum meruit is a doctrine derived from the natural law of equity, the basic concept of which is that no one should be unjustly enriched who benefits from the services of another. In order to prevent such an unjust enrichment, the law implied a promise to pay a reasonable amount for the services rendered * * *, in the absence of a specific contract." *Id.*
>
> The elements of an action in quasi-contract on a claim of unjust

enrichment are a benefit conferred, knowledge of the benefit by the receiving party, and a retention of the benefit under circumstances which would make it unjust to do so without payment. *Advanced Marketing Services, Inc. v. Dayton Data Processing, Inc.* (March 6, 1992), Montgomery App. No. 12607, unreported, at 4; *see also Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183.

*Caras v. Green & Green*, 2d Dist. Montgomery No. 14943, 1996 WL 407861, *3 (June 28, 1996). *See also LeVangie v. Raleigh*, 2d Dist. Montgomery No. 27946, 2019-Ohio-810, ¶ 16.

{¶ 53} The remedies of unjust enrichment and quantum meruit differ in how the damages are calculated. "[D]amages for unjust enrichment are 'the amount the defendant benefited,' while damages for quantum meruit are 'the measure of the value of the plaintiff's services, less any damages suffered by the other party.' " *Acquisition Servs., Inc. v. Zeller*, 2d Dist. Montgomery No. 25486, 2013-Ohio-3455, ¶ 60, quoting *U.S. Health Practices, Inc. v. Byron Blake, M.D., Inc.*, 10th Dist. Franklin No. 00AP-1002, 2001 WL 277291, *2 (Mar. 22, 2001).

{¶ 54} It is well established that a quasi-contract claim, and thus the remedy of quantum meruit, is unavailable when the subject of the dispute is governed by an express contract. *See, e.g., LeVangie* at ¶ 16, citing *Joseph Oldsmobile/Nissan, Inc. v. Tom Harrigan Oldsmobile, Inc.*, 2d Dist. Montgomery No. 14788, 1995 WL 276804 (May 10, 1995).

{¶ 55} In *Fox & Assocs. Co., L.P.A. v. Purdon*, 44 Ohio St.3d 69, 541 N.E.2d 448 (1989), the Ohio Supreme Court addressed a discharged attorney's ability to recover fees

under quantum meruit when the attorney and client had entered into a contingency agreement. The court held: "When an attorney is discharged by a client with or without just cause, and whether the contract between the attorney and client is express or implied, the attorney is entitled to recover the reasonable value of services rendered the client prior to discharge on the basis of quantum meruit." *Id.* at syllabus.

> One of the central tenets of the *Fox* approach is that a client has an absolute right to discharge an attorney or law firm at any time, with or without cause, subject to the obligation to compensate the attorney or firm for services rendered prior to the discharge. * * * Once discharged, the attorney must withdraw from the case, and can no longer recover on the contingent-fee-representation agreement. The discharged attorney may then pursue a recovery on the basis of quantum meruit for the reasonable value of services rendered up to the time of discharge."

(Citations omitted.) *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry*, 68 Ohio St.3d 570, 574, 629 N.E.2d 431 (1994).

{¶ 56} Unlike *Fox*, the case before us does not involve a contingency fee agreement. Rather, the parties signed an engagement letter in which Lipsky and NBA agreed to the Smith Firm's representation at specific hourly rates for Smith, his associates, and his paralegals. Lipsky and NBA were also responsible for payment of litigation expenses. Thus, on its face, all attorney fees and litigation expenses incurred during the representation were governed under the terms of the contract and were recoverable, if proven, by means of a breach of contract claim. With the exception of the $287.50 for work performed by an associate of the Smith Firm on April 20, the Smith

Firm's claim concerned charges incurred prior to the firm's withdrawal.

{¶ 57} As noted by Lipsky, the Smith Firm did not seek relief under equitable doctrines in its complaint. The firm simply alleged that Lipsky and NBA hired the Smith Firm, that the firm performed legal services for them, that a certain amount was due and owing, and that Lipsky and NBA had refused to pay. In this case, however, the applicability of quantum meruit arose based on issues raised at trial by Lipsky, not by the Smith Firm.

{¶ 58} The discussions of quantum meruit at trial span numerous pages of transcript, and the path to the final jury instructions was a winding one. Quantum meruit was first mentioned by the trial court in discussions between the parties and the court after opening statements. Lipsky asserted that the Smith Firm materially breached the parties' contract prior to the firm's withdrawal – in November 2016 and in its response to Lipsky's March 2017 request to alter the payment scheme -- resulting in a revocation of the contract. In response to Lipsky's assertions, the court inquired of Lipsky whether the firm would nevertheless be entitled to compensation for its services under quantum meruit. Throughout the trial, the trial court repeatedly stated to the parties that one of the issues raised in the trial was whether Lipsky and NBA benefited from the work performed by the Smith Firm, regardless of whether there was a contract.

{¶ 59} The beginning of the third day of trial involved a discussion of jury instructions. Lipsky requested instructions on "material breach" and the definition of a fiduciary, and the court agreed to give those instructions over the Smith Firm's objections. Lipsky further requested an instruction on repudiation of a contract, and the parties ultimately agreed to a statement that "both parties claim that each repudiated the terms

of the contract." The court told Lipsky that a discussion of repudiation "get[s] into this question of quantum meruit, which you object to." (Tr. at 965.) The court went on:

I've looked this up – it's very clear that you cannot accept the benefits of the contract and repudiate it at the same time. In other words, once, once the people in California accepted the benefits of Mr. Smith's work, then what you were trying to say is, we repudiate the contract, but send all that stuff out to California that you've been working on for the last six weeks. You can't have it both ways.

* * *

Although, although the existence of a quantum meruit remedy does not depend on a contract, it also – it is also a remedy in contract law where a contract has been breached but after one side received partial or full benefit, and the contract does not include a clause providing for this eventuality.

* * *

In other words, it doesn't provide that if this is breached, we owe you nothing.

(Tr. at 795-798.)

{¶ 60} Lipsky raised that Ohio law does not permit recovery under quantum meruit where there is a contract, to which the court responded, "Yeah, and that troubles me." At this juncture, Smith expressed that the court's intended instruction was proper, because it said quantum meruit applied if the jury found that there was no contract. (Tr. at 801-802.) When the court then asked, "Would it be simpler to say – take quantum meruit out, and simply say that he's [Smith] entitled to whatever he was entitled to up to

the point the contract was breached?" Smith responded that such an instruction was "okay with me." Lipsky disagreed, asserting that the breach would relieve him of any obligation to pay for any services. After Smith responded to Lipsky's argument, Lipsky stated:

> I would, I would take the quantum meruit that is there, but have a – an equal balance to an entire paragraph that leans to [Smith's] direction to more clearly state on our objection at the top of page two, Ohio law does not permit Plaintiff to recover under quantum meruit or unjust enrichment where there is a contract. I just – I want that. That's the truth. And then, but if there is not contract, then blah, blah, blah.

(Tr. at 807.)

{¶ 61} After further discussion of quantum meruit, Lipsky clarified that he believed there were multiple "repudiations" of the contract by the firm. The court then proposed to instruct the injury:

> When Plaintiff told Defendant he would no longer perform the terms of the contract to represent Defendant and his company in the California Federal District and State Court cases, did Plaintiff have the right to do so because of the non-payment of attorney's fees or apparent ability to pay on time, or was he obligated to continue to represent the Defendant because non-payment at that time or timely payment in the future was not a material breach of the original agreement because Plaintiff had always accepted late payments? Defendant proposed a new contract, that is lower payments, until court cases were concluded. Did Plaintiff have to accept the new offer

to replace the original contract or was the Plaintiff required to continue representing the Defendant?

(Tr. at 818-822, 843.)   Both parties agreed to this instruction.

{¶ 62} After closing arguments, the trial court raised with the parties that neither side had argued quantum meruit.   Smith immediately responded that the court should take out that instruction.   The court asked Smith whether he was "trying to recover for anything under the contract that [he] didn't do past * * * March," i.e. after he withdrew; Smith responded that there were a few billings (Tr. at 989-990.)   Lipsky then said he was also fine with removing the quantum meruit instruction.   (*Id.* at 990.)

{¶ 63} However, the trial court pointed out that a legal dictionary said, "[A]though the existence of quantum meruit remedy does not depend on a contract, it is also a remedy in contract law where a contract has been breached, but after one side received partial or full benefits, and the contract does not include a clause providing for this eventuality, such as liquidated damages in the event of a breach."   (Tr. at 991.)   The court summarized, "In other words, what they're saying is, they're saying that up to the point of breach where the parties have received benefits to the contract, that will be enforced."   (*Id.*)   Smith responded that, based on what the court had read, the quantum meruit instruction should stay in.   (Tr. at 991-993.)

{¶ 64} The court raised whether there was evidence on the value of the Smith Firm's services, and Smith reminded the court that he had testified that the value of his services equaled the amount billed.

{¶ 65} At this juncture, Lipsky said that both sides had agreed to take out the instruction on quantum meruit.   Smith corrected Lipsky, stating that he no longer agreed

to take it out.   Lipsky also emphasized that the Smith Firm breached the agreement in November, and a breach relieves a party of the duty of further performance.   The court told Lipsky that it had to instruct the jury on all relevant law and concluded that the correct law was: "If you find the Defendant proved that the Plaintiff breached the contract by changing its terms, the Defendant may not, however, accept the benefits of the contract before the breach without compensating the Plaintiff in quantum meruit."   (Tr. at 1010.)

{¶ 66} The trial court's final jury instructions informed the jury that the Smith Firm claimed that Lipsky "entered into a contract with it for legal services and that Defendant breached the contract causing the Plaintiff damages."   The court instructed the jury as to what was required for the Smith Firm to prove its claim and defined the terms "breach," "substantial performance," "repudiation," "good faith," and "fiduciary."   The instructions further addressed that a contract is interpreted against the party who drafted the contract (in this case, the Smith Firm), that acceptance of payments after a due date on prior occasions waives strict performance of a contract's due date requirements, and that evidence of past practice in paying bills was to be considered in order to give meaning to "past practice" in the contract.

{¶ 67} The trial court instructed the jury on quantum meruit, as follows:

Ohio law does not permit a person to recover under quantum meruit when there is a contract.   Plaintiff also claims that it is entitled to recover the reasonable value of the services it performed for the benefit of the Defendant.   Plaintiff may recover the reasonable value of these services if you find by the greater weight of the evidence that (A) the Plaintiff performed services for the Defendant's benefit and with the Defendant's knowledge;

and (B) the Defendant knew or should have known that the services were given with the expectation of payment of reasonable value; and (C) that the Defendant had a reasonable opportunity to prevent the Plaintiff from giving services prior to them being rendered by the Plaintiff. If you find that Defendant proved that the Plaintiff breached the contract by changing its terms, the Defendant may not however accept the benefits of the contract before the breach without paying the Plaintiff in "quantum meruit."

(Tr. at 1026-1027; Ct.'s Ex. 1.)

{¶ 68} The court did not provide the instruction, previously agreed upon by the parties, asking whether the firm had the right to stop representing Lipksy and whether it had to accept Lipsky's new proposed terms.

{¶ 69} The jury issued a general verdict in favor of the Smith Firm. Neither party requested interrogatories, and the jury was not provided interrogatories to indicate whether it found a breach of contract occurred or relied on quantum meruit in awarding the amount requested by the firm.

{¶ 70} "Jury instructions are critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5. A trial court is required to "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus (addressing Crim.R. 30(A), which is identical to Civ.R. 51(A)). Jury instructions "must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181,

657 N.E.2d 503 (1995), citing *Cincinnati v. Epperson*, 20 Ohio St.2d 59, 253 N.E.2d 785 (1969), paragraph one of the syllabus.

**{¶ 71}** Here, Lipsky asserts that no instruction on quantum meruit should have been given, because the parties' performance was governed by contract. Lipsky originally objected to the quantum meruit instruction on that basis. The trial court further noted that it was providing the last sentence of the quantum meruit instruction "over [Lipsky's] strenuous objection." (Tr. at 1010.) Lipsky does not claim on appeal that the trial court provided incorrect instructions on quantum meruit, and we accordingly decline to address that issue.

**{¶ 72}** Under the unique facts of this case, the trial court did not err in providing a jury instruction on quantum meruit, because the instruction stemmed directly from Lipsky's defense, i.e., that the Smith Firm had materially breached the contract in November 2016 and, as a result, Lipsky and the law firm were not operating under a contract when the Smith Firm provided legal services in 2017. Lipsky further asserted that the law firm again materially breached the contract in March 2017, when it demanded additional funds in response to Lipsky's proposal to modify the payment schedule. Lipsky claimed that the law firm's material breaches deprived him of the purposes of the contract – to be represented by the Smith Firm at trial – and relieved him of the obligation to pay, under the contract or otherwise.

**{¶ 73}** The jury heard evidence that the parties had entered into a contract (the engagement letter), and the jury was properly instructed that quantum meruit did not apply if a contract existed between the parties. However, Lipsky's arguments directly raised the question of whether the Smith Firm was entitled to receive payment representing the

value of its services in the event that the jury concluded, as Lipsky claimed, that a material breach by the law firm had occurred. Lipsky testified in detail about Smith's fiduciary obligations with respect to his (Lipsky's) dwindling assets in late 2016 and early 2017, that Smith changed the terms of the parties' agreement in his March 6 letter, and that NBA and Lipsky were deprived of the "fruit" of the contract (representation by the Smith Firm at trial in California) when the Smith Firm withdrew from representation. Lipsky asserted that the Smith Firm materially breached the agreement, relieving him of the obligation to pay. Smith testified that the invoices sent to NBA represented the value of the firm's services, providing the jury with evidence to determine the appropriate amount of damages under quantum meruit if it accepted Smith's arguments. Given the evidence and arguments at trial, the court did not err in providing an instruction on quantum meruit as a means of the compensating the law firm for the value its services if the contract were materially breached.

{¶ 74} Lipsky's second assignment of error is overruled.

## IV. Conclusion

{¶ 75} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and WELBAUM, J., concur.

Copies sent to:

John D. Smith
Andrew P. Meier
Andrew R. Mayle
Walter Blackham
Hon. James A. Brogan, Visiting Judge